CLEO V. FROST, plaintiff-appellee, v. DES MOINES STILL COLLEGE OF OSTEOPATHY AND SURGERY, appellant, and DR. ROBERT O. FAGEN, defendant-appellee.

No. 49040.

(Reported in 79 N.W.2d 306)

Nᴏᴠᴇᴍʙᴇʀ 13, 1956.

Rᴇʜᴇᴀʀɪɴɢ Dᴇɴɪᴇᴅ Jᴀɴᴜᴀʀʏ 18, 1957.

Alex M. Miller, of Des Moines, for defendant-appellant and defendant-appellee.

Duffield & Pinegar, of Des Moines, for plaintiff-appellee.

LARSON, J.—Plaintiff in her action at law for damages against the defendants Des Moines Still College of Osteopathy and Surgery and Dr. Robert O. Fagen relied upon the doctrine of res ipsa loquitur. She alleged that after she was anesthetized for the purpose of an operation on her back and while unconscious and under the exclusive control of the defendants, and when the defendants and each of them and their agents had exclusive control over all the instrumentalities involved, plaintiff was negligently burned on and about her abdomen. Each defendant denied liability and counterclaimed for unpaid hospital and doctor bills. Plaintiff confessed judgment on defendants' counterclaims and the jury returned a verdict in favor of Dr. Robert O. Fagen and against the defendant Des Moines Still College of Osteopathy and Surgery, later herein referred to as "the hospital." From a judgment of $6500 less the confessed hospital counterclaim of $478, or $6022, in favor of plaintiff, the defendant hospital appeals.

The record discloses the following facts largely undisputed. Des Moines Still College of Osteopathy and Surgery is an Iowa corporation not for pecuniary profit, and, in connection with a college, a hospital and clinic is maintained in Des Moines, Iowa. In addition to the permissive use of the hospital facilities by various doctors and surgeons, these facilities are used by the hospital employees. This personnel falls into three categories—professional, semiprofessional, and nonprofessional including students and interns.

Plaintiff suffered a back injury as a result of an automobile accident on January 20, 1953, and took treatments therefor at defendant's clinic during 1953. Doctor Fagen examined her in November 1953, and advised a back operation. On January 4, 1954, she entered defendant hospital for that purpose. On January 8, 1954, Doctor Fagen performed the operation which began at 9:30 a.m. Present during the operation were Doctor Fagen, the surgeon, Dr. Carl Nagy, the anesthetist, Richard Mayer, D. O., the surgical resident employed by the hospital and assigned by the hospital to assist Doctor Fagen in the operating room, and Ruth Johnston, the hospital's surgical nurse assigned to assist in the operation. At the time plaintiff was anesthetized

two "fellows" who brought her to the operating room, and a student named David Kronish, were still in the room. Whether or not others were there during the operation does not appear, and Doctor Fagen did not recall. Plaintiff was placed on the operating table face down, anesthetized, and as Doctor Fagen retired to the scrub room to scrub for the operation, plaintiff was finally prepped and draped for surgery. Prepping refers to the preparation of the skin in the surgical area including shaving, cleansing and things of that nature. It usually starts a day or so before the operation and is finally completed just before the surgeon operates. Although Doctor Fagen had the right to determine how plaintiff would be prepped, he gave no special instructions and did not know what solutions were used in the final preparation. Doctor Fagen observed nothing objectionable about the prepping and proceeded with the operation, which took four hours. After the operation was completed, a dressing was applied to the surgical area and hospital employees returned her to her room. Doctor Fagen did not see her again until the following morning.

When plaintiff regained consciousness in her hospital room about 7 p.m., the student David Kronish and her husband were present. She immediately complained, "My stomach hurts just terrible", and David Kronish replied, "Well, no wonder your stomach hurts, we had quite an explosion, you were the calmest one of the four of us." Later Kronish told her to forget the explosion, that it was a "joke."

When Doctor Fagen saw plaintiff the next morning he expressed surprise as he observed the burns on her abdomen. He testified there was no explosion during the course of the operation or in his presence. The hospital and Doctor Fagen made no charge for treating this injury which turned out to be first, second and third degree burns. This treatment ceased May 7, 1954. Substantial areas were involved and ugly scars remain, causing plaintiff both physical and mental distress.

Plaintiff tried to find out what happened, but nobody ever told her. No evidence was introduced herein to enlighten us as to what happened. Doctors, according to the nurses' records introduced into evidence, expressed the opinion that "Blisters on

abdomen *apparently from ether"* were discovered January 9, 1954, at 8:05 a.m. (Emphasis supplied.)

Complaint is made of the trial court's adverse rulings (1) on appellant's motion for directed verdict on the ground that the evidence showed that it could not and did not, as a corporation, exercise control or direction over Doctor Fagen, the surgeon, or Doctor Mayer in the treatment of plaintiff, or exercise any control over the instrumentalities used therein; (2) on appellant's motion to withdraw from jury consideration the allegations of negligence in plaintiff's petition for the reason that it was not shown to have exclusive control over the instrumentalities alleged to have caused the injury, and for the further reason that plaintiff did not identify the instrumentalities causing her injury, thereby making the doctrine of res ipsa loquitur inapplicable; and (3) on its motion for judgment notwithstanding the verdict for the same reasons. Complaint is also made that its exception to the court's instructions as improper were also wrongfully over-ruled. Because the principal issues are involved in each complaint, they will be discussed as one.

We believe the trial court properly submitted this case to the jury on the theory of res ipsa loquitur. We believe it properly determined by its ruling that the defendant corporation must answer for the negligence of its servants, agents and employees, and that the defendant corporation had "complete control" over its officers and employees excepting perhaps when they were personally engaged in the professional practice of osteopathy and surgery. We agree that the burden was upon the defendant corporation to produce proof that its officers or employees were not acting for it at the time in question, and that the trial court properly determined that the question as to whether, when plaintiff's injury was incurred, the defendant corporation or the surgeon, or either of them, was in exclusive control, became a fact question for the jury.

The crux of the case resolves itself around two main issues upon which this court has not previously made pronouncement and upon which there is little authority elsewhere. The first issue, stated simply, is whether or not in cases of this nature and circumstances it is necessary under the doctrine of res ipsa

loquitur for plaintiff to prove what instrumentality or instrumentalities caused her injury; and the second, what liability a corporated hospital has for the acts or omissions of its officers, employees or attachés when a patient under anesthesia is injured by the lack of due care while in the hospital for treatment or surgery. Both issues are not without difficulty of solution and were well presented and argued by able counsel.

 I. The doctrine of res ipsa loquitur has been the subject of many articles, textbook pronouncements, and court decisions. 35 Iowa L. Rev. 393; Prosser on Torts, page 295; 9 Wigmore, Evidence, Third Ed., section 2509, page 382; Whetstine v. Moravec, 228 Iowa 352, 291 N.W. 425, and cases cited therein; Ybarra v. Spangard, 25 Cal.2d 486, 154 P.2d 687, 162 A.L.R. 1258; Pendergraft v. Royster, 203 N. C. 384, 166 S.E. 285; Vonault v. O'Rourke, 97 Mont. 92, 33 P.2d 535; Maki v. Murray Hospital, 91 Mont. 251, 7 P.2d 228. It is a simple understandable rule of circumstantial evidence with a sound background of common sense and human experience, and difficulty comes only when we attempt to transform it into a rigid legal formula, which arbitrarily precludes its application in many cases where it is most important that it be applied. This is such a case. We should, in applying the rule, not forget the particular force and justice of the rule. It is regarded as a presumption throwing upon the party or parties charged with the duty of producing evidence of the circumstances, to come forth with the evidence, whether culpable or innocent, which is particularly accessible to him or them, but inaccessible to the injured person. 9 Wigmore, Evidence, Third Ed., section 2509, page 382, Ybarra v. Spangard and Whetstine v. Moravec, all supra; Ross v. Double Shoals Cotton Mills, 140 N. C. 115, 52 S.E. 121, 1 L. R. A., N.S., 298; Maki v. Murray Hospital, supra.

In the recent pronouncement of the California Supreme Court in Ybarra v. Spangard, supra, the court said at page 490 of 25 Cal.2d, page 689 of 154 P.2d, page 1262 of 162 A. L. R.: "* * * it is difficult to see how the doctrine can, with any justification, be so restricted in its statement as to become inapplicable to a patient who submits himself to the care and custody of doctors and nurses, is rendered unconscious, and receives

some injury from instrumentalities used in his treatment. Without the aid of the doctrine a patient who received permanent injuries of a serious character, obviously the result of someone's negligence, would be entirely unable to recover unless the doctors and nurses in attendance voluntarily chose to disclose the identity of the negligent person and the facts establishing liability."

Clearly the same reasoning must apply to the corporate hospital and its servants. It must be included among those required in such cases to reveal the true facts concerning the instrumentality involved and the ones at fault. Maki v. Murray Hospital, supra.

We also agree with the California court in the Ybarra case, supra, when it said: "If this were the state of the law of negligence, the courts, to avoid gross injustice, would be forced to invoke the principles of absolute liability, irrespective of negligence, in actions by persons suffering injuries during the course of treatment under anesthesia."

We conclude as did Judge Lehman in Galbraith v. Busch, 267 N. Y. 230–234, 196 N. E. 36–38, that the doctrine of res ipsa loquitur is not an arbitrary rule. It is rather a common-sense appraisal of the probative value of circumstantial evidence. If such a construction is not considered broad enough to cover such cases as the one before us, then we must apply therein the rule adopted in certain carrier passenger cases where all that need be shown to get the benefit of the res ipsa loquitur inference of negligence is to show the relationship at the time, and that an injury was sustained due to some mishap. In such carrier passenger cases it is also unnecessary to show that the instrumentalities were under the exclusive control and management of the carrier. 35 Iowa L. Rev. 393. It is difficult to see a greater justification or need for the extension of this doctrine to carrier passenger cases than to hospital, doctor, patient cases, especially when one is injured while under anesthesia. We cannot agree with counsel for defendant that plaintiff should be forced to use the right of discovery by interrogatories, or that such procedure would be adequate.

In the instant case plaintiff placed herself in the care and

custody of the doctor-surgeon and the hospital employees or attachés, and from the time she lost consciousness until she awakened some nine and one-half hours later she did not know what instrumentalities were used on her nor how she was injured. The injury was of a kind which ordinarily does not occur in the absence of someone's negligence. Whether the doctor or the hospital attachés were then acting in a professional, semiprofessional or nonprofessional capacity, she would not know. She brought action against Doctor Fagen, the surgeon in charge, and properly assumed that if the injury occurred during the operation proper by him or his temporary assistants, in a professional capacity, he would be liable (41 Am. Jur., Physicians and Surgeons, section 112, page 223), but that if the injury occurred while defendant-appellant was undertaking to perform other nonprofessional or simple manual acts of an administrative nature through its servants, then of course the hospital would be liable. 26 Am. Jur., Hospitals and Asylums, section 14, pages 595 to 597.

It was sufficient that plaintiff disclosed that the injury resulted from an external force applied while she lay unconscious in the hospital, and we conclude that it satisfies the requirement that the plaintiff identify the instrumentality causing her injury. It is as clear an identification as such a plaintiff of her own knowledge may ever be able to make, and under the doctrine of res ipsa loquitur the law should require no more.

It is also manifestly unreasonable to insist that she identify any one of the persons who came in or remained in the operating room or moved her back to her own room after the operation, as the person who did the alleged negligent act.

She knew she had received a burn on a part of her body not involved in the actual operation. Was the burn occasioned by an explosion of an inflammable antiseptic while she was being returned to her room, by some negligent act of an attendant doing a simple manual act, or did it occur in the operating room in some other manner, or during the operation?

We think it is a just and logical conclusion that one who, while undergoing a surgical operation, sustains an unusual injury to a healthy part of his body not within the area of the

operation, be not precluded from invoking the doctrine of res ipsa loquitur in an action against the doctors and nurses participating in the operation. The same thing must be said of the corporate hospital regarding its preceding or subsequent care of the patient. This is not altered by the fact that all the parties do not stand in such relation to one another that the acts of one may be regarded as the acts of the other, and that the injury may have been caused by the separate acts of any one of them, or by the fact that there were several instrumentalities and no showing as to which caused the injury or as to the particular defendant in control of it. Ybarra v. Spangard, supra.

The jury believed the doctor that no explosion or injury occurred during the operation, and that he, including his temporary professional assistants, was not at fault during the operation proper. Unless then it is proper to assume other professional services were being rendered plaintiff, regardless of her knowledge or consent, while she was under anesthesia—and we do not think it is—any other tasks being performed by the hospital employees or attachés must have been of an administrative nature.

II. Defendant contends that the evidence does disclose professional services were being rendered plaintiff by the nurses, house physician and others. The prepping, it says, was performed when Doctor Fagen was not present but was out in the scrub room. While there was no evidence as to how the plaintiff was prepped, except that it was in the "routine manner", it is true there appears by an exhibit introduced, an assumption by the house physician that the burn was an ether burn, and by Doctor Fagen that it could have resulted from too free use of ether in sterilizing or final prepping of plaintiff's back so that excessive amounts ran down her sides and saturated the sheet under her. In such a case it would be unable to evaporate due to her weight above and a rubber sheet below, and the burns could result. But no one testified that this was the cause or as to who performed that task. No one even testified this was professional service, and we cannot take judicial notice that it was. Nevertheless, defendant contends such circumstances dis-

304

close some professional services were being rendered by doctors and nurses who were not under the hospital's control and not under Doctor Fagen's immediate supervision and control; that the hospital corporation could not practice medicine or osteopathy and that these independent parties might have caused the injury. For those acts, it reasons, defendant-appellant was not responsible because those practitioners could not have been under the exclusive control of this defendant nor of the surgeon.

██ Of course this is a novel defense. At that time all persons known to have been in the operating room, a place provided and controlled by the hospital, except perhaps Doctor Fagen, were students or employees of the hospital. They were there, we presume, *to perform professional tasks at the request of Doctor Fagen* or *manual tasks at the request of the hospital.* If they assumed other tasks wrongfully, the principal must still answer for their tort. The surgeon required only the regular hospital administrative type of routine prepping. Hospital attachés performed that task as hospital employees. We are aware there are cases which hold that prepping is considered a part of the operation proper, and in some cases this may well be, especially where special prepping is required. Even if such were the case here, it would not aid defendant-appellant, for an error then by temporary assistants of the surgeon might have been found Doctor Fagen's responsibility. As to this issue the jury found in his favor. In fact, a careful study of the record fails to reveal that the so-called "prepping" done in this case was any more than the "standard" procedure or simple manual act done by servants, attachés or students of the hospital, and therefore we do not feel called upon here to decide whether prepping generally is in fact the practice of osteopathy and surgery. Proof is totally lacking that it was so in this case. Failure of hospital servants or attachés to do any such administrative or simple manual acts with due care would, of course, constitute negligence for which the principal may be held liable under the doctrine of Respondeat Superior, regardless of the servant's title, license or professional position. Berg v. New York Society, 1 N.Y.2d 499, 154 N.Y.S.2d 455, 136 N.E.2d 523.

Also see Bing v. Thunig and St. John's Episcopal Hospital,

1 App. Div.2d 887, 888, 149 N. Y. S.2d 358, 359, which was a case where a patient was burned while under anesthesia and while being operated upon. There the court said: "Although *disobedience of an absolute direction to a hospital attaché to carry out a simple manual act, which direction is in pursuance of a medical determination, is an administrative omission for which the hospital would be liable,* * * * there was no proof here of the existence of any rule, direction or instruction to these hospital attachés * * *." (Emphasis supplied.)

There the court divided 3 to 2 only on the issue of whether there was proof of a rule, direction or instruction to the attachés.

Here, however, Doctor Fagen neither requested nor directed special prepping, and asked only that the hospital administration have plaintiff prepared for the operation. It may therefore be fairly inferred, we think, that the hospital administration sent its personnel in to prep plaintiff in the standard routine manner, and this of course must be done carefully and prudently. In the absence of proof that any tasks being performed, with the exception of those of the surgeon, were of a professional nature, they must be found to be administrative.

From the record we learn Mr. Parmenter, the hospital administrator, testified that the doctor has control over surgery, and the hospital and the doctor exercise *all* of the control in the operating room; that the hospital does not have control over the doctor in the operating room relative to the care of the patient; and that the hospital would not have control over the doctors in performing their professional functions in the operating room; also that with the exception of when the doctors are performing their professional functions or are temporarily loaned to another physician or surgeon, the hospital kept "complete control over (all) employees."

Clearly, then, except when employees, regardless of class, were "loaned" or were engaged in the practice of osteopathy, this hospital determined and directed their duties and made assignments. With those exceptions it had "complete" control over the doctors and nurses employed by it. In such cases it seems only just and proper to require satisfactory proof by the master that its servant was not acting as its servant at

the time or times in question. This is not a new burden for we said in Anderson v. Abramson, 234 Iowa 792, 794, 13 N.W.2d 315, 316: "But the burden is upon the general employer to establish not only that he loaned the servant but that he surrendered control and direction over the servant to the borrower", citing Hooper v. Brawner, 148 Md. 417, 129 A. 672, 42 A. L. R. 1437, and quoting with approval the rule stated in 35 Am. Jur. 971, section 541. He who has control over servants must respond in damages for the servants' acts. Avellone v. St. John's Hospital, 165 Ohio St. 467, 135 N.E.2d 410 (July 18, 1956) and cases cited therein; Berg v. New York Society, supra.

We are, therefore, satisfied that here it became the hospital employer's burden and duty to prove it was not the master in control at the time of the injury to plaintiff. Conceivably defendant-appellant could escape liability by a satisfactory showing at that time it did not control its servants (1) because they were loaned to another, or (2) that they were acting as independent practitioners of osteopathy. We think the hospital's showing as a matter of law was insufficient, and thus the question of corporate control of the instrumentalities was properly left for jury determination.

Justice Rutledge, in President and Directors of Georgetown College v. Hughes, 76 U. S. App. D. C. 123, 130 F.2d 810, 827, pointed out that "the law's emphasis ordinarily is on liability, not immunity, for wrongdoing", and we may also observe that public policy abhors the classification and inference brought about by so-called "protected negligence." We strive to eliminate it—not foster and encourage it.

Although it is true the professional discretion of hospital staff doctors cannot be controlled by the nonlicensed corporation (State v. Bailey Dental Co., 211 Iowa 781, 234 N. W. 260; State v. Kindy Optical Co., 216 Iowa 1157, 248 N. W. 332) nevertheless even those individuals, while performing nonprofessional functions under the master-servant relationship, will not protect the corporation from liability for its servant's negligence. Annotation Malpractice—Res Ipsa Loquitur, 162 A. L. R. 1265–1274; Armstrong v. Wallace, 8 Cal. App.2d 429, 47 P.2d 740; Ranelli v. Society of N. Y. Hosp., 269 App. Div. 906, 56

2d 481, 295 N. Y. 850, 67 N.E.2d 257. In the latter case liability was approved where a nurse neglected to place furnished side boards for the bed, and a delirious patient recovering from anesthesia rolled out of bed to the floor causing injuries. The court said there: "\* \* \* the failure of the head nurse to have the side boards attached to the bed was a failure in an administrative function wherein she was acting as the servant of the hospital which was liable for her negligence."

 Defendant-appellant suggests that its professional servants are only made "available" for needed services by hospital patients and thus professional services rendered would not be those of the hospital. This too is a novel position taken to avoid liability, but we do not believe any patient seeking hospital services is so impliedly employing professional personnel of the hospital, although again this proposition may be subject to factual proof. Nevertheless if such professional services are performed and charged for unlawfully by the hospital, we fail to find this a good defense for the negligence of the hospital employee or the hospital. A delivery boy driving without a license may still subject his master to liability for his negligent act.

 Finally, defendant-appellant contends the substituted petition charged the corporate defendant with exclusive control of the personnel and instrumentalities used in the performance of the operation on Mrs. Frost, but this is not quite true, for plaintiff extends the time involved as the period when she was unconscious. Its defense that the corporate defendant exercised no such control because it had no power to exercise such control during the period of the actual operation may be true. Its contention that since the corporate defendant could not legally practice osteopathy and surgery, Mrs. Frost was bound to know that the personnel who performed the operation were not acting for the corporate defendant, may also be true. The trouble, of course, with those propositions is that they confine the time of the injury to the *time of the operation*, and such is not plaintiff's allegation, nor is that defense good for the period just prior to and after the operation proper when plaintiff was clearly not under professional custody or control. Furthermore, defendant-

appellant's declaration that it is not a corporation for profit avails it nothing, for that fact does not relieve it of the torts of its officers and employees. Haynes v. Presbyterian Hosp. Assn., 241 Iowa 1269, 45 N.W.2d 151.

III. Appellant also complains of the court's ruling excluding defendant's Exhibit 54, the same being the record of a settlement between the American Automobile Insurance Company, carrier of insurance for the other party involved in the original automobile collision. Defendant claims this evidence of settlement competent, for its effect was to work a satisfaction of any claim plaintiff had against defendant. However, we do not agree that the cause brought herein was for an aggravation of the original injury, but was, as plaintiff contends, a new and separate cause of action due to a new and distinct injury affecting a different part of plaintiff's anatomy, and one which defendant alone was accused of inflicting upon her. Therefore, defendant's release of the original tort-feasor does not bar the present action for damages due to the new and unrelated injury. The exhibit was properly rejected. Piedmont Hospital v. Truitt, 48 Ga. App. 232, 172 S.E. 237; Andrews v. Davis, 128 Maine 464, 148 A. 684; Noll v. Nugent, 214 Wis. 204, 252 N.W. 574.

IV. As a final proposition, defendant-appellant contends that a new trial should have been granted for the reason that the damages were excessive, thereby reflecting passion, prejudice and undue influence by the jury. We cannot agree. We have so often said a verdict should not ordinarily be set aside because of its excessiveness or inadequacy unless it is so excessive or inadequate as to shock the conscience. In re Estate of Hollis, 235 Iowa 753, 16 N.W.2d 599. From the record we find considerable testimony as to plaintiff's pain and suffering over an extended period of several months during the treatment of these burns, and added discomfort from itching and burning thereafter. The scars, visible when brief garments are worn, may or may not disappear, but certainly plaintiff has had to suffer considerable physical and mental anguish due to this injury, and as to how much longer this condition will exist even the experts did not appear certain. Her demand of $24,-907.08 was reduced to $6500 by the jury, and while we may or

N. Y. S. may not agree with that exact figure, the jury has performed its function and its determination did not appear to shock the conscience of the trial court, nor does it ours. Such verdicts we have said are not the satisfactory subject of comparison, for each case must be determined by the evidence introduced to justify the recovery claimed. We have even said the changing value of the dollar makes money comparisons of little value. For recent cases upon this matter, see our pronouncements in Elings v. Ted McGrevey, Inc., 243 Iowa 815, 53 N.W.2d 882; Turner v. Hansen, 247 Iowa 669, 75 N.W.2d 341; Dunham v. Des Moines Ry. Co., 240 Iowa 421, 35 N.W.2d 578; Jettre v. Healy, 245 Iowa 294, 60 N.W.2d 541; Nichols v. Snyder, 1956, 247 Iowa 1302, 78 N.W.2d 836.

Having found no reversible error, the judgment of the trial court must be and is affirmed.—Affirmed.

All JUSTICES concur.